**IN THE COURT OF APPEALS OF IOWA**

No. 22-2047
Filed March 8, 2023

**IN THE INTEREST OF Z.D.,**
**Minor Child,**

**C.D., Mother,**
     Appellant.
_____

Appeal from the Iowa District Court for Pottawattamie County, Scott Strait, District Associate Judge.

A mother appeals the termination of her parental rights to one child. **AFFIRMED.**

Whitney A. Estwick, Omaha, Nebraska, for appellant mother.

Brenna Bird, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Roberta J. Megel of the State Public Defender, Council Bluffs, attorney and guardian ad litem.

Considered by Vaitheswaran, P.J., and Greer and Chicchelly, JJ.

**CHICCHELLY, Judge.**

C.D. appeals the termination of her parental rights to one child, Z.D. She contends that reasonable efforts at reunification were not made, the statutory grounds are unsatisfied, and an exception should be granted due to the closeness of the parent-child bond. Upon our de novo review, we affirm the termination of her parental rights.

## I. *Background Facts and Proceedings.*

Z.D. was born in 2015. The Iowa Department of Health and Human Services investigated her home in 2017, 2018, and 2020 due to allegations involving denial of critical of care, dangerous substances, unsanitary living conditions, and physical abuse. In January 2021, an intake was called into the department's hotline alleging sexual abuse by Z.D.'s father. He later pled guilty to sexually abusing Z.D. and was sentenced to a term of incarceration. His parental rights were terminated, and he does not appeal. Z.D. reported that she told her mother about her father's behavior, but her mother would laugh or say Z.D. was lying. Z.D. also reported being instructed to stay in the bedroom with her parents while they engaged in sexual intercourse.

In February, Z.D. was removed from her mother's care upon a finding the mother failed to provide adequate shelter, which was premised on unsanitary conditions in the home. Workers discovered animal feces and urine, an infestation of cockroaches and other bugs, rotting food, and trash throughout the home. Z.D. was placed with her aunt on March 1 and has remained in her home for the duration of this case. After five months of attempting to engage the mother in

services with little to no progress, the department opted to pursue court involvement.  In August, Z.D. was adjudicated a child in need of assistance (CINA).

Initially, Z.D. and her mother enjoyed unsupervised visits, which were considered semi-supervised because they did not extend to overnights.  The mother completed parenting courses on the ABC's of sexual abuse and seeking safety, but she failed to partake in several other recommended courses.  The mother completed a psychological evaluation and engaged in mental-health therapy.  She attended therapy consistently from August 2021 to April 2022.  The family support specialist testified that she had trouble getting the mother to sign a release of information so that the department could communicate with the therapist because the mother claimed the therapist was a liar.

In December, the mother's visitation regressed to fully supervised due to lack of compliance with the safety plan, which instructed that no unapproved adults were allowed at visits.  Z.D. came back from visits talking about having met her "new daddy."  An unknown adult male also attended Z.D.'s school program with her mother, and it was discovered he had a criminal history of domestic violence. It was also clear Z.D. and the man had met before based on their interaction and because he had posted a picture with Z.D. on social media during a recent visit. Z.D. also reported another adult male kissing her with his tongue and that her mother told her it was okay because he was a friend.  The mother denies condoning the behavior and said that individual would not be around because she did not feel he was a safe person.  However, that specific individual was reportedly helping the mother clean her home during the month prior to the termination hearing.

In late January 2022, the department approved the mother's new home for visitation. During the termination hearing, the caseworker testified that she did not know why visitation never actually occurred at the home. A progress report dated February 20, 2022, noted that no visits occurred during that reporting period because "[the mother] didn't want to attend these scheduled visits" and did not want "to bring [Z.D.] into the situation." Visits occurred at the family access center because Z.D.'s aunt requested that visits stop occurring in her home due to the mother making inappropriate comments around Z.D. and the aunt's children.

In March, Z.D.'s psychiatrist recommended suspending visits with her mother for a few weeks of evaluation due to self-harming behaviors and suicidal comments after interactions. It was recommended that visits begin again in a therapeutic setting, meaning under supervision of a licensed therapist. The department placed Z.D. and her mother on a waiting list for this purpose and recommended the mother utilize the intervening time to complete her psychiatric evaluation and continue individual therapy. In mid-June, the department learned the mother had not attended therapy since late April. It was discovered that the therapist's office cancelled her appointment in May, and the mother had difficulty getting rescheduled. The caseworker testified that the mother removed herself from the waiting list for therapeutic visits with Z.D. in order to pursue her own options. The mother testified that she did not do so and should still be on the list to her knowledge. The record reflects an email exchange in June in which the mother informed the department of a family therapist she found, but the department informed her that it would need the mother's psychiatric evaluation and

an update from her individual therapist prior to family therapy. Therapeutic visits never occurred.

In June, the mother completed a psychological evaluation with a new therapist who diagnosed her with adjustment disorder with anxiety. The therapist's letter notes that nothing suggested that a psychiatric evaluation would be necessary for the mother. On July 1, an intake was reported to the police department, and it was requested that contact between Z.D. and her mother be suspended until the investigation could be completed. On July 22, the department was informed that the investigation was suspended and contact could be initiated again. The county attorney filed its petition to terminate parental rights in July.

On August 4, Z.D. and her mother visited over the phone, which was their first contact since April. Their subsequent contact was limited to phone and video calls leading up to the termination hearing. Z.D. reportedly asked her mother if she would do certain things to her if she got to see her again, such as lock her in her room or hit her. Z.D. also exhibited self-harming behaviors during the calls by picking at herself until she drew blood. Afterwards, she experienced nightmares, was clingy, exhibited heightened anxiety, and continued to pick her skin. In the two months prior to the termination hearing, Z.D. expressed approximately five times that she did not want to see her mother. The caseworker visited the mother's home in August and concluded that it was unfit for visits due to significant trash on the floor, cockroaches on the wall, old food on the counter and floor, and an unknown male staying at the residence.

After Z.D.'s attorney and guardian ad litem filed a motion to suspend visitation, the court held a hearing regarding whether to continue contact in mid-

September. The court denied the motion on September 21. Z.D. and her mother shared a video call on September 22. The court held a hearing on the petition to terminate parental rights on September 26. After the court terminated her parental rights, the mother filed a timely appeal.

## II. Review.

Our review of termination proceedings is de novo. *See In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000). "We will uphold an order terminating parental rights where there is clear and convincing evidence of the statutory grounds for termination. Evidence is clear and convincing when there is no serious or substantial doubt as to the correctness of the conclusions of law drawn from the evidence." *In re T.S.*, 868 N.W.2d 425, 431 (Iowa Ct. App. 2015) (internal citation omitted). We give weight to the juvenile court's fact findings, especially those about witness credibility, although they are not binding. *See* Iowa R. App. P. 6.904(3)(g); *C.B.*, 611 N.W.2d at 492.

## III. Discussion.

The principal concern in termination proceedings is the child's best interests. *In re L.T.*, 924 N.W.2d 521, 529 (Iowa 2019). Iowa courts use a three-step analysis to review the termination of parental rights. *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). Those steps include whether: (1) grounds for termination have been established, (2) termination is in the child's best interests, and (3) we should exercise any of the permissive exceptions to termination. *Id.* at 472–73.

### A. Grounds for Termination.

Here, the juvenile court found the State proved by clear and convincing evidence that termination of the mother's parental rights was appropriate under

paragraphs (e) and (f) of Iowa Code section 232.116(1) (2022). We may affirm if the record supports termination on any one ground. *See In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012). We confine our analysis to paragraph (f), under which the court may terminate if it finds all of the following:

> (1) The child is four years of age or older.
> (2) The child has been adjudicated a [CINA] pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

The fourth element is at issue: whether the child could be returned to the parent's care at the time of the termination hearing. *See In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting the term "at the present time" to mean "at the time of the termination hearing").

We agree with the juvenile court that Z.D. could not be returned to her mother's care at the time of the termination hearing. The department expressed concern about the mother refusing to take accountability for her involvement with the department and needing to demonstrate an ability to maintain safe supports and provide age-appropriate supervision. The family support specialist testified:

> Every time that I would try to talk about having safe people around, [the mother] would say that he's already out of the house and that it's already taken care of, and so it was kind of hard to work on that. I tried to bring it up a couple other times, and then she just said the problem is already gone.

Besides unknown men encountered at the home, the mother also continued to have contact with the father during his incarceration despite her reports of physical

and emotional abuse by him in the past. One month prior to the termination hearing, the mother's physical home was still found to be unfit for Z.D. due to unsanitary conditions and an unknown male staying at the residence. Ultimately, we share in the district court's conclusion that the mother "has failed to demonstrate the protective capacity to prevent further trauma, abuse or neglect of [Z.D.]." "It's folly to think the mother will stand sentinel to protect against a foe she doesn't acknowledge exists." *In re D.D.*, 955 N.W.2d 186, 193 (Iowa 2021). We affirm the court's finding that Z.D. could not be returned to her mother at the time of the termination hearing.

*B. Reasonable Efforts.*

The mother argues the department did not make reasonable efforts at reunification because it failed to provide visits for a significant period of time. *See* Iowa Code § 232.102(7) (2022) (requiring that the department "make every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child"). However, the mother does not point to any portion of the record where she identified a deficiency in agency services prior to the filing of the petition for termination. Moreover, the mother did not raise the issue of reasonable efforts at the termination hearing. Therefore, we find the argument waived. *See In re C.H.*, 652 N.W.2d 144, 148 (Iowa 2002) ("In general, if a parent fails to request other services at the proper time, the parent waives the issue and may not later challenge it at the termination proceeding."); *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

*C. Best Interests.*

The mother argues that she "loves her daughter and did not believe it was in her best interests to have her parental rights terminated with respect to her daughter." She does not otherwise advance a best-interests argument with support from the record or other authorities. *See* Iowa R. App. P. 6.1401–Form 5 (instructing that the petition include findings of fact or conclusions of law with which the petitioner disagrees and why, generally referencing a particular part of the record, witnesses' testimony, or exhibits that support the petitioner's position). If this was an attempt to raise such an argument, we find it waived. *See Goode v. State*, 920 N.W.2d 520, 524 (Iowa 2018) ("Our appellate rules of procedure and judicial restraint expect claims raised on appeal be specific. A party who fails to satisfy this standard risks waiving the issue." (internal citations omitted)). Even if an argument was advanced, we would find Z.D.'s best interests do not warrant continuing a parent-child relationship and therefore support termination.

*D. Exception to Termination.*

Finally, the mother argues an exception to termination should be granted because of the parent-child bond that she and Z.D. share. *See* Iowa Code § 232.116(3)(c) (providing a discretionary exception to termination when "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship."). The provisions of section 232.116(3) are "permissive, not mandatory," and the parent bears the burden to prove the applicability of an exception to termination. *A.S.*, 906 N.W.2d at 475–76. Despite the mother's love for her child, "our consideration must center on whether the child will be disadvantaged by termination." *D.W.*, 791

N.W.2d at 709. The caseworker testified that Z.D. has a bond with her mother but not the type of safe or nurturing bond that Z.D. shares with her aunt. We do not find a parent-child relationship so strong that it outweighs the need for termination. *See In re W.M.*, 957 N.W.2d 305, 315 (Iowa 2021) (finding the existence of a bond is insufficient when parents have "failed to provide the clear and convincing evidence necessary to show that, on balance, that bond makes termination more detrimental than not").

## IV. Disposition.

Having reviewed the mother's arguments regarding the statutory grounds, reasonable efforts, and an exception to termination, we find each without merit and affirm termination of her parental rights.

**AFFIRMED.**